JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant American Cancer Society, Ohio Division, Inc. ("ACS"), appeals from the following actions of the trial court: (1) the denial of ACS's motion for summary judgment on the cross-claim of defendant-appellee Girl Scouts of Lake Erie Council ("GSLEC"); (2) the granting of GSLEC's motion for summary judgment and the award of attorney fees in favor of GSLEC on its cross-claim against ACS; (3) the granting of GSLEC's motion for a protective order with respect to ACS's request for production of documents to the GSLEC; and, (4) the denial of ACS's motion to substitute the insurers of GSLEC as real parties in interest. For the reasons adduced below, we affirm in part, and reverse and remand in part.
{¶ 2} A review of the record on appeal indicates that the underlying action originated on October 7, 1999, when the parents[1] of minor child, plaintiff Dakota R. "Cody" Weiner, and the minor child, filed their complaint against ACS and GSLEC for injuries sustained by Cody Weiner in June of 1999 while he was engaged in horseback riding at Camp Friendship[2], a week-long summer camp experience for childhood cancer patients sponsored by ACS at no expense to those attending. The premises used for Camp Friendship in 1999, known as Camp Crowell/Hilaka in Richfield, Ohio, is owned by GSLEC; the use of Camp Crowell/Hilaka for Camp Friendship was pursuant to a fee based facility use agreement entered into between ACS and GSLEC. The number of participants for the Camp Friendship week in question was 130 people (92 campers, 28 counselors, and 10 Camp Friendship staff). See Facility Use Agreement at 1. GSLEC provided the horses and horse program staff to the participants.
{¶ 3} Cody Weiner died from his injuries on February 12, 2000, after which the parents filed an amended complaint, alleging, in part, negligence and wrongful death. GSLEC filed its answer to this amended complaint, which included a cross-claim against ACS. On November 28, 2000, the parents, in separate settlement agreements with each defendant, settled all of their claims against ACS and GSLEC.[3]
{¶ 4} On December 8, 2000, GSLEC filed an amended cross-claim against ACS alleging (a) breach of duty to defend by ACS and (b) for indemnification under paragraph 5 of the Guest Group Facility Use Agreement entered into between ACS and GSLEC.
{¶ 5} GSLEC filed its motion for summary judgment on its cross-claim. This motion was opposed by ACS who filed a cross-motion for summary judgment on the GSLEC cross-claim, which filing was captioned in the alternative as a motion to substitute real parties interest, seeking the court to name GSLEC's insurers, St. Paul Guardian Insurance Company and Crum Forster, as real parties in interest. ACS also filed a request for production of documents upon GSLEC, which provided responses for some of the requested items but sought a protective order with regard to the remaining ACS requests.
{¶ 6} The trial court, on May 31, 2001, granted (a) GSLEC's motion for summary judgment on its cross-claim against ACS and (b) GSLEC's motion for protective order, and denied (c) ACS's motion for summary judgment on the GSLEC cross-claim and (d) ACS's motion to substitute the GSLEC's insurers as real parties in interest.
{¶ 7} On August 23, 2001, ACS and GSLEC stipulated as to the amount of attorney fees incurred by GSLEC in its defense of the lawsuit.
{¶ 8} On September 4, 2001, the trial court entered final judgment in favor of GSLEC and against ACS in an amount disclosed in paragraph 2 of the settlement, plus stipulated attorney fees in the amount of $120,699.81.
{¶ 9} ACS's appeal from these orders presents four assignments of error for review.
{¶ 10} Prior to addressing the assignments presented, we note the following standard of review for cases involving summary judgment:
 {¶ 11} When reviewing an appeal of a summary judgment, this court reviews the case de novo. Locsei v. Mayfield School District, No. 75277, unreported, 2000 Ohio App. LEXIS 1179, at *19. Summary judgment is appropriately rendered when no genuine issue as to any material fact remains to be litigated; the moving party is entitled to judgment as a matter of law; it appears from the evidence that reasonable minds can come to but one conclusion; * * * and when the evidence is construed most favorably in favor of the party opposing the motion the conclusion reached is adverse to that party. Id., citations omitted.
 {¶ 12} The burden of proof in a motion for summary judgment is a shifting one. First, the moving party bears the initial burden of demonstrating that there are no genuine issues of material fact concerning an essential element of the opponent's case. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (emphasis in original). Although there is no requirement in Civ.R. 56 that the moving party support its motion for summary judgment with any affirmative evidence, i.e., affidavits or similar materials produced by the movant * * * [,] it is clear that the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of material fact on a material element on the nonmoving party's claim. Id. at 292.
 {¶ 13} Once the moving party has satisfied this criteria, the burden then shifts to the nonmoving party, who has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. Id. at 293. (Emphasis omitted.)
{¶ 14} Hood v. Classic Cuts Produce, Inc. (May 17, 2001), Cuyahoga App. No. 78065, 2001 Ohio App. LEXIS 2190 at 4-6.
{¶ 15} The first assignment or error provides:
 {¶ 16} I. THE TRIAL COURT ERRED IN DENYING THE MOTION FOR SUMMARY JUDGMENT OF AMERICAN CANCER SOCIETY ON THE CROSS-CLAIM OF GIRL SCOUTS OF LAKE ERIE COUNCIL.
{¶ 17} In this assignment appellant generally argues that the activity which the decedent minor was engaged in at the time of his injury, horseback riding, is outside the scope of Section 5(b) of the Guest Group Facility Use Agreement and thereby not subject to indemnification.
{¶ 18} In assessing the construction of the contract in issue, we are guided by the following:
 {¶ 19} Indemnity is the right of a party, who has been compelled to pay what another should have paid, to require reimbursement. It arises from a contract, either express or implied. In the construction of a written contract, it will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. The language and terms of the contract are to be given their plain, common, and ordinary meanings. But if the language is ambiguous, then a court must construe the language against the party who prepared the contract. Language is ambiguous if it is reasonably susceptible to two or more constructions. (Footnotes omitted.)
{¶ 20} McClory v. Hamilton Cty. Bd. of Elections (1998),130 Ohio App.3d 621, 624-624, citing Worth v. Aetna Casualty SuretyCo. (1987), 32 Ohio St.3d 238, 240, 513 N.E.2d 253, 256; Foster WheelerEnviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.78 Ohio St.3d 353, 361, 1997-Ohio-202, 678 N.E.2d 519, 526; CentralRealty Co. v. Clutter (1980), 62 Ohio St.2d 411, 413, 406 N.E.2d 515,517; and, George H. Olmsted Co. v. Metropolitan Life Ins. Co. (1928),118 Ohio St. 421, 426, 161 N.E. 276, 277.
{¶ 21} The Facility Use Agreement states in pertinent part the following:
{¶ 22} 1. USE OF THE PROPERTY
 {¶ 23} GSLEC, as owner of Camp Crowell/Hilaka located in Richfield, Ohio, which is owned primarily for functions of the Girl Scouts, is authorizing the use of this camp facility for the dates specified above to CF for its own purposes not related to any Girl Scout activity.
{¶ 24} * * *
 {¶ 25} It is understood that GSLEC has insurance to cover its liabilities for Girl Scout activities ONLY and that CF shall carry commercial general liability insurance to cover all CF use, activities and personnel during the approved use of the camp facility * * *.
{¶ 26} 2. FACILITY USE FEES:
 {¶ 27} The base facility use fee which CF agrees to pay GSLEC in accordance with paragraph 3, Guest Group Deposit And Fee Payment, herein, is $36,300 which is the minimum charge for up to 130 CF participants, (staff, campers and counselors) for the facility use and services as defined in this Agreement. For each additional person beyond 130, the charge will be $250 per person up to the maximum camp occupancy of 200.
 {¶ 28} For the base facility use fees paid, GSLEC will provide the following facility use and services to CF:
 {¶ 29} * Cabins, selected tent sites, Gund Dining Hall and Kitchen, and Garfield Hall
 {¶ 30} * 2 lakes and boating equipment for boating and fishing
{¶ 31} * Pool and shower house
{¶ 32} * Challenge/ropes course
 {¶ 33} * Crowell/Hilaka administrative staff to assist CF in use of facilities
{¶ 34} Meal and Kitchen Services*
 {¶ 35} Food, food preparation, food service and clean-up shall be provided by professional cooks/kitchen supervisors and kitchen aides. GSLEC shall contract with a caterer to provide food and most food preparation. The meal service includes:
{¶ 36} * * *
{¶ 37} Program Services
 {¶ 38} GSLEC shall provide CF with the outdoor programs offered by "specialists" listed below, weather permitting. Alternative indoor programs shall be offered in lieu of outdoor programs during inclement weather.
{¶ 39} * Pool Hours of Operation:
 Swimming will be available from 9:00 a.m. til 5:00 p.m. Monday through Friday, weather permitting. Swim times will be 50 minutes with 10 minute rest periods every hour. Any special request will be made in advance with the Crowell/Hilaka Camp Director. A maximum of 50 people will be allowed in the pool per session, staffed by certified lifeguards
 {¶ 40} * Boating Hours of Operation: Row boating and/or canoeing will be available form (sic) 9:00 a.m. til 5:00 p.m. Monday-Friday, weather permitting. Boating times will be 50 minutes, which will include preparation for boating and entering and exiting time. There will be a 10 minute rest period between boating times. A maximum of 24-36 will be allowed to boat at one time per session, staffed by waterfront certified staff
 {¶ 41} * Nature Walks: Staffed by one naturalist
 {¶ 42} * Challenge Course/High Ropes: Scheduled by age level and ability (4th grade and up on the challenge course and 6th grade and up on the high ropes), up to 12 per session, staffed by challenge course facilitators
 {¶ 43} * Horseback Riding: Two sessions (rides) per camper; billed at $15 per person; per session
{¶ 44} * * *
 {¶ 45} 5. GUEST GROUP INDEMNIFICATION OF GSLEC
 {¶ 46} CF agrees to indemnify, defend, and hold GSLEC harmless from and against any and all claims, damages, demands, actions, duties, causes of action, judgments, costs, (including attorney fees), controversies and liabilities whether known or unknown, fixed or contingent, arising out of contract, tort or otherwise, in law or in equity, asserted by third parties (including but not limited to CF's participants) for damage to person or property, including but not limited to, consequential or incidental damages arising out of or related to: (a) CF's failure to perform any and all of its obligations or liabilities under the Agreement or under any other agreement; (b) CF's use of the camp facility; (c) the negligent, willful or intentional acts/omissions of CF or any of its agents, employees, invitees, or licensees; (d) the failure of CF or any of its agents, employees, invitees or licensees to comply with all applicable federal, state and local laws, ordinances, statutes, regulations and rules, including but not limited to discrimination laws, the Americans with Disabilities Act (ADA) and environmental laws.
{¶ 47} Appellant presents five issues with regard to this assignment, including: (A) horseback riding is not a "use" of the camp facility pursuant to Section 5(b) of the Agreement, see appellant's brief at 16-20; (B) the term "use" in Section 5(b) of the Agreement is ambiguous and therefore its construction and coverage must be resolved in favor of ACS, see appellant's brief at 20-25; (C) Ohio law prevents indemnification of GSLEC for its own acts of willful and wanton misconduct, see appellant's brief at 25-27; (D) the Agreement does not indemnify GSLEC for willful and wanton misconduct on its part and GSLEC failed to apportion the settled claims between negligence and willful and wanton misconduct, see appellant's brief at 27-29; and, (E) GSLEC materially breached the Agreement and violated R.C. 2305.321 with regard to the settlement and release with plaintiffs, thereby prejudicing the rights of the potential indemnitor, ACS, see appellant's brief at 29-31. These five issues will be addressed seriatim.
 A
{¶ 48} In this issue appellant initially posits that horseback riding activity is not a "use" of the camp facility, but is a "service." Appellant relies upon an interpretation of Section 2 of the Agreement distinguishing between "facility use,: and individually identified "services" therein, and Section 5(b) of the Agreement which mandates indemnification for damages resulting from CF's "use of the facility." Appellant believes that the individually listed "services" under Section 2 consist of two specific groups, meal and kitchen services, and program services, with program services consisting of, in part, horseback riding. Hence, according to appellant, since horseback riding is defined by the Agreement as a "program service," it cannot be covered by Section 5(b) as a facility "use." Appellant next argues that its obligation to indemnify is limited pursuant to Section 5(b) to damages arising out of only "CF's use of the camp facility," not to the invitee decedent's use of the camp facility. See appellant's brief at 18. Therefore, since decedent was using the facility in the form of horseback riding at the time of the injury, and CF was not partaking of the horseback riding, then CF is not liable to indemnify.
{¶ 49} Appellee, on the other hand, stresses with regard to the first sub-issue that the physical plant of the premises, aka facility use (including cabins, lakes, pools, rope course, and administrative staff), and the meal and program services (which would include horseback riding), should be interpreted as being part of the CF's overall "use of the facility" since these structures and functions are included under the title of Section 2 of the Agreement, which title is "Facility Use Fees." As to the second sub-issue, appellee argues that Section 5(b) is not limited solely to CF's use of the facility, but also applies to activities for, and injuries to, CF's participants.
{¶ 50} Appellant's first sub-issue is without merit. Appellant attempts to provide a very narrow definition of the term "use" by distinguishing the utilization of that term vis-a-vis "service" as those terms are employed in Section 2 of the Agreement. However, Section 2 is not a definition section. Instead, Section 2 merely identifies the camp facilities and services which GSLEC will provide, and the manner in which those camp services will be accommodated, for a fee, to CF during its period of using the camp facilities. The Agreement does not provide a definitions section. Since the term "use" is not defined in the Agreement, we must interpret the meaning of the term. We note that Section 5(b)'s application of the term "use" is as a noun. When used in the context of a noun, the commonly accepted definition of the term "use" means "[A]ct of employing everything; application, as the use of a pen, * * *." Black's Law Dictionary (6 Ed. 1991) 1072. Thus, Section 5(b) of the Agreement, which presently says "CF's use of the camp facility," is interpreted to mean "CF's act of employing everything of the camp facility." As interpreted, the act of employing everything of the camp facility subsumes those facility uses and services which were necessary for the CF experience and for which ACS bargained with GSLEC. Accordingly, horseback riding for the CF participants is included within the term "use" of the camp facility.
{¶ 51} Turning to the remaining sub-issue, ACS parses the language of Section 5(b) in a most restricted fashion as it attempts to limit Section 5's application to solely ACS/CF's use of the camp facility, arguing that the "Settled Claims arose from the acts and omissions of GSLEC and are outside the scope of § 5(b)." Appellant's brief at 19. The plain language of Section 5 states that "CF agrees to indemnify * * * and hold GSLEC harmless from and against any and all claims, damages, demands, actions, duties, causes of action, judgments, costs, (including attorney fees), controversies and liabilities whether known or unknown, fixed or contingent, arising out of * * * tort * * *, asserted by third parties (including but not limited to CF's participants) for damage to person or property * * * related to: * * * (5)(b) CF's use of the camp facility; * * *." Giving the language employed by Section 5(b) their commonly understood meaning, we conclude that the scope of Section 5(b) contemplates indemnification by CF for claims asserted by third parties, including CF's participants such as the decedent herein, for injuries to decedent's person which are related to CF's use of the camp facility. The settled claims between GSLEC and plaintiffs are evidence of a claim to GSLEC related to the operation of CF by ACS. As previously determined, horseback riding by CF participants is within CF's use of the camp facility. Therefore, the indemnification provision is applicable to ACS/CF.
 B
{¶ 52} In this sub-issue, appellant argues that Section 5(b) of the Agreement is ambiguous, therefore, this ambiguity, which was drafted by GSLEC, must be resolved in favor of ASC/CF and defeat indemnification for the plaintiffs' claims in this action. This argument is rendered moot by virtue of the holding in sub-issue A, supra, that the Agreement is not ambiguous and does reach the plaintiffs' claims against GSLEC herein.
 C
{¶ 53} In this sub-issue, appellant argues that GSLEC seeks indemnification under Section 5 of the Agreement for its own "negligence and its willful and wanton misconduct." Appellant's brief at 25. Appellant posits that Ohio law provides that "an agreement may exculpate a person from negligence only where the language doing so is clear and unambiguous." Id. at 26. Appellant concludes that the parties' Agreement "does not contain clear and unambiguous language indemnifying GSLEC for its own negligence." Id.
{¶ 54} While exculpatory clauses which relieve a party of one's own negligence are not favored by the law, such clauses are not against public policy. Glaspell v. Ohio Edison Co. (1987), 29 Ohio St.3d 44, 46. Unless the language employed by these types of exculpatory clauses is clear and unambiguous, the clause must be strictly construed against the drafting party. Id. at 47. Further, exculpatory clauses do not have to specifically list "negligence" for liability for negligence to be excluded. Id. at 47-48. It is sufficient that the general terms of the contract, when considered by a reasonable person of like-minded knowledge, would understand that a party was relieved of its own negligence. Swartzentruber v. Wee-K Corp. (1997), 117 Ohio App.3d 420,425. An exculpatory clause concerning liability for negligence will be enforced:
 {¶ 55} (1) when the contracting parties stand in roughly equal bargaining positions, or (2) even if greater disparity exists in the relative positions of the contracting parties, when nonexculpatory contract options are provided for a greater consideration, instead of accepting the risk of the superior party's negligence.
{¶ 56} Orlett v. Suburban Propane (1989), 54 Ohio App.3d 127,128.
{¶ 57} The present case does not demonstrate that the parties, both sophisticated long-standing corporations, were anything but equal in bargaining position, therefore there is no issue with regard to whether the Agreement was unconscionable. Accordingly, if the exculpatory clause is unambiguous, the clause will be enforced.
{¶ 58} While Section 5 does not list "negligence" within the exculpatory clause of that Section, the Section does identify "any and all" claims relating to CF's use of the camp facility, whether the negligence was perpetrated by GSLEC or not. It cannot be reasonably argued that the Agreement is ambiguous with regard to the types of claims arising from the CF's use of the camp for which GSLEC sought to be held harmless; all means all, and as long as the claim was related to CF's use of the camp facility, which the horseback riding certainly was, the indemnification clause applies despite the exculpatory clause not listing "negligence" with specificity. See Wells v. American Elec. Power Co. (1988), 48 Ohio App.3d 95; Conkey v. Eldridge (Dec. 2, 1999), Franklin App. No. 98AP-1628, 1999 Ohio App. LEXIS 5635 at 16-17.
 D
{¶ 59} In this sub-issue, appellant argues that, contrary to Ohio law, Section 5(b) relieves GSLEC for responsibility for its own alleged willful and wanton misconduct in failing to follow recognized safety standards associated with the equine program at CF.[4]
{¶ 60} In Ohio, while one may contractually relieve oneself for responsibility for acts of negligence, one may not contractually relieve oneself for responsibility for acts constituting willful and wanton misconduct. Bowen v. Kil-Kare, Inc. (1992), 63 Ohio St.3d 84, 90; Harshv. Lorain Cty. Speedway, Inc. (Cuyahoga, 1996), 111 Ohio App.3d 113,117.
{¶ 61} Appellant, at 27 of appellant's brief, citing toOtterbacher v. Brandywine Ski Center, Inc. (May 23, 1990), Summit App. No. 14269, notes that "willful misconduct" includes,
 {¶ 62} Intentional execution of a wrongful course of conduct which one knows should not be carried out, or the intentional failure to do something which one knows should be done under circumstances tending to disclose that one knows or should know that injury to another will be the probable result of such conduct.
{¶ 63} GSLEC's settlement agreement with plaintiffs constituted a full release with respect to all claims and causes of action arising out of the decedent's 1999 accident at CF. This settlement agreement was not an admission of liability by GSLEC, see settlement agreement at page 6, but was a compromise and settlement of disputed claims between the parties to the agreement. This agreement was silent as to the apportionment of the settlement between negligence claims and willful and wanton misconduct claims.
{¶ 64} Appellee argues that there is no evidence to demonstrate that it acted with specific intent to injure the decedent. Appellant counters with the August 14, 2000 expert report of Jana Z. Dawson, a copy of which was attached to its motion for summary judgment at Exhibit C, which concluded that the acts and omissions of GSLEC in the equine activities it provided at CF constituted willful and wanton misconduct. ACS attempted to authenticate the Dawson expert report through the affidavit of Diane Holmes, ACS's Director of Patient Services who helped negotiate the Facility Use Agreement between the parties. Ms. Holmes averred that "I have reviewed Exhibit C, and it is a true and accurate copy of the report of Jan (sic) Dawson provided by Richard Dempsey, counsel for plaintiffs." See Holmes affidavit, paragraph 23, attached to ACS's motion for summary judgment at Exhibit D. The authentication, or lack thereof, of the Dawson report was not raised at the trial court, and the trial court did not strike the expert report from the record.
{¶ 65} On appeal, appellee argues, for the first time, that the Dawson expert report cannot be considered for purposes of summary judgment because it was not properly authenticated. Issues not raised before the trial court cannot be raised for the first time on appeal.Blausey v. Stein (1980), 61 Ohio St.2d 264, 266-267; Shibley v. Time,Inc. (Cuyahoga, 1975), 45 Ohio App.2d 69, 75; D'Agostino v. Holowka
(Mar. 22, 1979), Cuyahoga App. No. 38545, 1979 Ohio App. LEXIS 9919 at 4-5. Lacking an objection to the trial court regarding the authentication of the Dawson report, the trial court could properly consider this piece of evidence. Fusek v. Petroff (Feb. 11, 1993), Cuyahoga App. No. 64169, 1993 Ohio App. LEXIS 730 at 3, citing Brown v. Ins. Co. (1978),63 Ohio App.2d 87, 90; Whiteleather v. Yosowitz (1983), 10 Ohio App.3d 272,273.
{¶ 66} The presence of Dawson's expert report raises a genuine issue of material fact as to whether GSLEC acted in a willful and wanton manner in its provision of equine activities at CF, and whether GSLEC's settlement with plaintiffs attempted to release responsibility for acts of willful and wanton misconduct. The extent to which GSLEC's acts and/or omissions constituted willful and wanton conduct, and the amount of the settlement apportioned to claims of willful and wanton misconduct, which is not permissible under law, must be determined by the fact finder for purposes of overall indemnification. Accordingly, summary judgment on this issue was improper to either party.
 E
{¶ 67} In this sub-issue appellant argues breach of the Facility Use Agreement by GSLEC in not obtaining an effective release from those participating in the horseback riding program, a release which purportedly did not meet the safety and waiver standards of R.C. 2305.321, and which failure prejudiced ACS by not avoiding liability for the claim for which GSLEC now seeks indemnification. ACS did not assert this breach of contract claim before the trial court, thereby waiving the issue on appeal. Blausey v. Stein, supra.
{¶ 68} In summary, the first assignment of error is affirmed in part and reversed and remanded in part.
{¶ 69} The second assignment of error provides:
 {¶ 70} II. THE TRIAL COURT ERRED IN GRANTING GSLEC'S MOTION FOR SUMMARY JUDGMENT AND AWARDING ATTORNEY'S FEES IN FAVOR OF GSLEC ON ITS CROSS-CLAIM AGAINST ACS.
{¶ 71} In this assignment appellant attacks the award of attorney's fees to GSLEC based upon the arguments in the first
assignment being determined in favor of ACS. Having determined that summary judgment was improperly granted due to issues involving the apportionment of the GSLEC settlement between negligence and willful and wanton misconduct claims, there arises a genuine issue of fact with regard to the amount of attorney fees involving settled claims attributable to indemnifiable negligence claims. The award of attorney fees is therefore reversed until the existence and amount of indemnifiable negligence claims in the GSLEC settlement with plaintiffs is determined.
{¶ 72} The third assignment of error provides:
 {¶ 73} III. THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR PROTECTIVE ORDER FILED BY GSLEC WITH RESPECT TO ACS'S REQUEST FOR PRODUCTION OF DOCUMENTS TO GSLEC.
{¶ 74} In this assignment appellant argues that the trial court erred in issuing a protective order concerning the following items ACS had sought in a discovery request propounded upon GSLEC: (1) all drafts of the Facility Use Agreement in issue; (2) the drafts of any Facility Use Agreements from 1998, or any other year, between ACS and GSLEC; (3) any drafts of the assignment and trust agreement entered into between GSLEC and its insurers, St. Paul Guardian Insurance Company and Crum 
Foster Insurance Company; and, (4) all documents relating to the assignment and trust agreement entered into between GSLEC and its insurers, St. Paul Guardian Insurance Company and Crum Foster Insurance Company.[5] Appellee sought protection for these documents based on relevancy and overbreadth. Appellant claims that the lack of this discovery impaired its ability to respond to the GSLEC motion for summary judgment.
{¶ 75} The following is relevant to this assignment:
 {¶ 76} As this court stated in Lillback v. Metropolitan Life Ins. Co. (1994), 94 Ohio App.3d 100, 640 N.E.2d 250, "parties who find themselves in the position of having to respond to a motion for summary judgment before adequate discovery has been completed must seek their remedy through Civ.R. 56(F)." Id. at 103. A party who fails to seek such relief does not preserve his right to challenge the adequacy of discovery upon appeal. R R Plastics, Inc. v. F. E. Myers Co. (1993), 92 Ohio App.3d 789, 798, 637 N.E.2d 332; Stegawski v. Cleveland Anesthesia Group, Inc. (1987), 37 Ohio App.3d 78, 87, 523 N.E.2d 902.
{¶ 77} Civ.R. 56(F) states:
 {¶ 78} "Should it appear from the affidavits of a party opposing the motion for summary judgment that he cannot for sufficient reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just."
{¶ 79} Clark Cty. Solid Waste Management District v. DanisClarkco Landfill Co. (1996), 109 Ohio App.3d 19, 36.
{¶ 80} The record does not reflect that ACS made a motion for a continuance pursuant to Civ.R. 56(F) so as to obtain the protected discovery for use in the summary judgment proceedings before the trial court. Accordingly, it cannot now challenge the adequacy of summary judgment-related discovery.
{¶ 81} The third assignment of error is overruled.
{¶ 82} The fourth assignment of error provides:
 {¶ 83} IV. THE TRIAL COURT ERRED IN DENYING THE MOTION OF ACS TO SUBSTITUTE REAL PARTIES IN INTEREST.
{¶ 84} Appellant argues that the trial court should have granted its motion to substitute GSLEC's insurers as real parties in interest because those insurers, having paid the settlement amount to plaintiffs on behalf of GSLEC, were subrogees on GSLEC's cross-claim for indemnification.
{¶ 85} Appellant's argument overlooks the fact that, following the GSLEC settlement with plaintiffs, GSLEC and its insurers executed an assignment trust agreement in which the insurers assigned any rights of recovery and subrogation they may have against ACS to GSLEC, "retaining no rights or causes of action unto themselves," and that in the event of a settlement or judgment in favor of GSLEC, that GSLEC would hold that settlement or judgment, less the costs of GSLEC, in trust for the insurers. See assignment agreement attached to ACS's motion for summary judgment, at page 3 of Exhibit F.
{¶ 86} The test for determining who is a real party in interest is: "Who would be entitled to damages?" Young v. Merrill, Lynch,Pierce, Fenner Smith, Inc. (Cuyahoga, 1993), 88 Ohio App.3d 12,16, citing Nuco Plastics, Inc. v. Universal Plastics, Inc. (1991),76 Ohio App.3d 137, 143, and Lyons v. Chapman (1931), 40 Ohio App. 1,6.
{¶ 87} As trustee of an express trust or as a party to a contract in whose name a contract (trust agreement) has been made for the benefit of another (the insurers), GSLEC was authorized to sue in the insurers' name without joining the insurers as a party to the action. See Civ.R. 17(A)[6], 25(C); Accord Centennial Equities Corp. v. Wizard Group,Inc. (Mar. 17, 1994), Cuyahoga App. No. 64898. Further the real party in interest, the party who would get the money involved in the cross-claim for indemnification, was, by virtue of the trust agreement, GSLEC. We conclude that, under the facts presented, the trial court acted within its discretion in not ordering the substitution of parties.
{¶ 88} The fourth assignment of error is overruled.
Judgment affirmed in part, and reversed and remanded in part.
This cause is affirmed in part and reversed in part and remanded to the lower court for further proceedings consistent with this opinion.
The court finds there were reasonable grounds for this appeal. It is, therefore, considered that said appellant(s) and appellee(s) each pay one-half of the costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
KENNETH A. ROCCO, P.J., and FRANK D. CELEBREZZE, JR., J., CONCUR.
[1] The parents of Master Weiner are plaintiffs Scott Weiner and Debie Hirschkorn.
[2] Camp Friendship is identified as CF in the group use agreement entered into between the parties.
[3] These settlement agreements were filed with the trial court on December 29, 2000, under seal.
[4] The Plaintiffs' alleged negligence and willful and wanton conduct by the defendants. See complaint at paragraph 6.
[5] GSLEC argues that it complied with ACS's discovery request to provide the originals of the Facility Use Agreements entered into between ACS and GSLEC, and the original of the assignment and trust agreement entered into between GSLEC and its insurers.
[6] Civ.R. 17(A) provides in pertinent part:
 (A) Real party in interest. Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his name as such representative without joining with him the party for whose benefit the action is brought. * * *.