JOURNAL ENTRY
{¶ 1} On May 7, 2003, this court released State v. Wade, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351. The printed version of that opinion contains a clerical error. Specifically, on page twenty-seven the case refers to the Lorain County Court of Common Pleas. The text of on page twenty-seven is hereby amended to refer to the Medina County Court of Common Pleas.
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant, Brian G. Wade, appeals from the judgment of the Medina County Court of Common Pleas, which convicted him of rape. We affirm.
 {¶ 2} On November 1, 2001, the Medina County Grand Jury indicted Defendant on one count of rape, in violation of R.C. 2907.02(A)(2); one count of kidnapping, in violation of R.C. 2905.01(A)(4); and one count of sexual battery, in violation of R.C. 2907.03(A)(1) and (2). The parties engaged in discovery. Thereafter, Defendant filed a motion for independent psychological examination of the victim which was denied.
 {¶ 3} The case proceeded to trial and the jury found defendant guilty of rape. Defendant was found not guilty of sexual battery and kidnapping. Subsequently, Defendant was adjudged a sexually oriented offender and sentenced to a prison term of five years. Defendant timely appealed raising nine assignments of error, which have been rearranged and consolidated for purposes of review.
 ASSIGNMENT OF ERROR VIII
"The court committed error at law and abused its discretion in permitting Nurse Pruliere to testify as to the complainant's answers to certain questions while at the St. Thomas Hospital."
 {¶ 4} In his eighth assignment of error, Defendant maintains that the trial court abused its discretion by permitting Nurse Pruliere to testify as to the statements of the victim, Tara Shank ("Tara"). We disagree.
 {¶ 5} A trial court has broad discretion to determine whether a statement should be admissible as a hearsay exception. State v. Dever (1992), 64 Ohio St.3d 401, 410. A trial court's decision will not be reversed absent an abuse of discretion. See id. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible unless it falls under one of the recognized exceptions to the hearsay rule. Evid.R. 802. Pursuant to Evid.R. 803(4), "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule, even if the declarant is available as a witness. The rules do not require that the individual diagnosing or treating the declarant be a physician in order for the exception to apply. In re Wheeler, 9th Dist. No. 20503, 2002-Ohio-1254, 2002-Ohio-1254, at ¶ 15. Additionally, Evid.R. 803(4) includes diagnosis or treatment related not only to physical injuries, but also psychological injuries as well. Id.
 {¶ 6} At trial, Nurse Pruliere testified to the statements Tara made to her while at the hospital, for purposes of examination and treatment. Tara indicated that she had been vaginally raped. While testifying, Nurse Pruliere asserted that she was a forensic nurse examiner who worked with the "Developing Options for Violent Emergencies" Program. She has received sexual assault nurse examiner training. Nurse Pruliere stated that her duties are to treat and perform medical assessments of patients and explained that it is "not within [her] role" to determine if a patient has been raped. Accordingly, we conclude that the trial court did not abuse its discretion in allowing Nurse Pruliere to testify regarding Tara's statement that she was raped by a male as it was pertinent to accurate diagnosis and thus admissible under Evid.R. 803(4). See State v. Rowland, 10th Dist. No. 01AP-1417, 2002-Ohio-4442 ¶ 26 (finding that hospital records reflecting a victim's statement that she was raped by a male were pertinent to accurate diagnosis and admissible under Evid.R. 803(4)). Defendant's eighth assignment of error is overruled.
 ASSIGNMENT OF ERROR IV
"The court committed prejudicial error by permitting the admission of certain testimony of the complainant from her mother as it was not relevant, or if relevant, its prejudicial effect outweighed its probative value."
 {¶ 7} In his fourth assignment of error, Defendant argues that the court committed prejudicial error by allowing into evidence irrelevant testimony concerning Tara's IQ. Defendant's allegations lack merit.
 {¶ 8} Irrelevant evidence is not admissible at trial. Evid.R. 402. "Relevant evidence" encompasses "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Although relevant evidence is generally admissible at trial, Evid.R. 403(A) provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." However, "[a] trial court enjoys broad discretion in admitting evidence. [A reviewing] court will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice." State v. Long (1978), 53 Ohio St.2d 91, 98. An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Furthermore, when applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621.
 {¶ 9} In the present case, Defendant was convicted of rape. R.C.2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Defendant was also charged with sexual battery, in violation of R.C. 2907.03(A)(2), and kidnapping, in violation of R.C. 2905.01(A)(4). Sexual battery is defined as engaging "in sexual conduct with another, not the spouse of the offender, when *** [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." R.C. 2907.03(A)(2). The provision on kidnapping states that "[n]o person, by force, threat, or deception, or, in the case of a victim *** mentally incompetent, by any means, shall *** restrain the liberty of the other person *** [t]o engage in sexual activity *** with the victim against the victim's will[.]" R.C. 2905.01(A)(4).
 {¶ 10} Thus, the trial court may reasonably conclude that the IQ of a victim relates to the elements of sexual battery or kidnapping; a high or low IQ can make the existence of a "substantial impairment" more or less probable. Additionally, an IQ evaluation may bear on the mental incompetence of a victim. Accordingly, the trial court could correctly conclude that the evidence was relevant.
 {¶ 11} Defendant also argues that the prejudicial effect of the evidence of Tara's IQ outweighed its probative value and therefore should have been excluded. See Evid.R. 403(A). We disagree. The jury convicted Defendant of rape and found him not guilty of sexual battery and kidnapping. There is no indication in the record that the testimony either confused the jury as to the issues in the trial or misled the jury as to the charges against Defendant. As such, this is not a case where the trial court clearly abused its discretion and the defendant thereby suffered material prejudice. Accordingly, Defendant's fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR I
"The verdict of the jury was not supported by sufficient evidence."
 ASSIGNMENT OF ERROR II
"The verdict of the jury was against the manifest weight of the evidence."
 ASSIGNMENT OF ERROR VII
"The court erred to the prejudice of *** Defendant's rights to a fair trial by overruling [Defendant's] request for a direct[ed] verdict of acquittal at the appropriate stages of the proceedings."
 {¶ 12} In his first and seventh assignments of error, Defendant maintains that there was insufficient evidence to convict him of rape. Additionally, Defendant contends, in his second assignment of error, that his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 13} As a preliminary matter, we note that sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins (1997),78 Ohio St.3d 380, 386. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000) 9th Dist. No. 19600, at 3, citing Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring).
 {¶ 14} When a defendant asserts that his conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 15} Defendant was found guilty of rape. R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Force is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). The force necessary to commit the crime of rape may be subtle and psychological; "[a]s long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." State v. Daniel (Sept. 13, 2000), 9th Dist. No. 19809, at 9, quoting State v. Eskridge (1988),38 Ohio St.3d 56, 59.
 {¶ 16} In the instant case, Tara testified at Defendant's trial. Tara was twenty-one years old at the time and worked at a nursing home in Seville, Ohio as an aide. She has a driver's license and graduated from Norwayne High School where she attended "special classes" at the career center. Tara lives with her mother Brenda Shank ("Brenda"), her cousin Felicia, and her mother's boyfriend.
 {¶ 17} Tara asserted that she was familiar with Defendant from school. They rode the same bus together throughout their childhood years. Recently, Tara recalled seeing Defendant outside his home while she and Felicia were visiting the cemetery, which is located adjacent to Defendant's house. Felicia waived and said "hi." Tara indicated that Felicia had wanted to visit Defendant's house. So, shortly thereafter they walked over and Felicia knocked on Defendant's door. Defendant's father opened the door and invited them in and notified Defendant that he had visitors. Tara, Felicia, and Defendant went to the basement where Defendant's room was located. Tara testified that all three were positioned on Defendant's bed and were watching television; she and Defendant were lying down on the bed. She asserted that they never kissed. Tara recalled placing her head on Defendant' s chest. She stated that she did not stop Defendant when he put his hands on her stomach and chest. Defendant drove the girls home later that afternoon. As Tara was exiting the truck, Defendant whispered for Tara to "come back by [her]self."
 {¶ 18} Thereafter, on a Thursday in October, 2001, Defendant called Tara to see if she was going to come over to his house that Friday. Tara did not give Defendant a definitive answer. That Friday, Tara went to Defendant's, after work, to "[j]ust look, watch TV or a movie or something." Tara asserted that she had no thoughts of having sexual relations with Defendant.
 {¶ 19} When Tara arrived at Defendant's, he was outside mowing the lawn. Tara recalled that Defendant turned the mower off to talk to her. They then went inside to his room. Tara explained that she turned on the TV and sat in the chair next to his bed; Defendant sat on his bed. As Tara was looking at a magazine, Defendant took it and placed it on the bed next to him. Tara stated that she went to retrieve the magazine and then remained on Defendant's bed. Tara indicated that Defendant began to ask her questions; "He asked [her] if [she] ever had sex with [her] old boyfriend *** and he *** asked [her] if [she] would have sex with him and [she] said no." Tara then told Defendant she was going to go home and he responded "that he wasn't going to let [her]." She explained that she was scared of Defendant and was afraid that he was going to hurt her. Tara stated that Defendant then tried to take her pants off; he "[t]ugged on them and he pulled at the leg and [she] pulled away from him." Defendant tried again and was able to remove her pants and her underwear. Tara asserted that she was unable to stop him.
 {¶ 20} After Defendant removed her clothing, he momentarily left the room. Tara did not know where he went. Tara explained that she did not try to escape "[b]ecause [she] was afraid that if he saw [her] *** trying to leave, he wouldn't let [her] go. He already told [her] that he wasn't going to let [her] go." When Defendant returned he climbed onto the bed and "started having sex with [her]." Tara stated that she did not try to stop him because she was scared "[t]hat she might get hurt worse than [she] already was." Tara further testified that as Defendant was on top of her she was "watching TV *** [b]ecause [she] didn't want to look at him. *** [She] didn't like him."
 {¶ 21} As Defendant was having sex with Tara, she told him that "he [had] to stop [b]ecause [her] legs were hurt from being in the air." Defendant complied and then left the room. Tara began to dress. As she was putting her shoes on Defendant returned with two cans of "pop" which they shared. Shortly thereafter, Defendant walked Tara upstairs and explained that he had to take a friend to a meeting. Tara then went home. She stated that she and Defendant had never kissed during this encounter.
 {¶ 22} That evening, Tara relayed to Felicia what had occurred while visiting Defendant's home. Tara told Felicia that "[she] needed to tell mom but [she] didn't know how [she] was going to tell her." The next day, Tara arrived at work upset and confided in Amanda Baker ("Baker"). After her conversation with Baker, Tara went home and told her mother, Brenda ("Brenda"), what had happened. Tara stated that Brenda was "mad" and "wanted to get it taken care of." Thereafter, Brenda took Tara to the hospital to have her examined.
 {¶ 23} Nurse Pruliere, the forensic nurse examiner who attended to Tara, also testified at trial. She explained that when assessing a patient, she looks for physical findings that may be "significant or *** helpful in finding out what is wrong with that patient and treating them." Examples of indicators are semen or other bodily fluids, foreign particles, hairs, etc. Nurse Pruliere testified that she found lacerations in Tara's posterior foreshet area and noticed bruising and redness of the hymen and the lower portion of her cervix. There were no outward signs of bruising on the body. Nurse Pruliere indicated that these findings were consistent with sexual assault. However, she stated that some of these findings could be consistent with normal or vigorous sexual activities. Additionally, Nurse Pruliere testified that when taking Tara's medical history, she relayed to her that she had been raped.
 {¶ 24} Baker, Tara's co-worker, also offered her testimony at trial. Baker recalled seeing Tara on Saturday, the day after the incident occurred. Tara was very "down" and introverted at work. When Baker inquired as to why, Tara began crying and said "he had forced her. *** She said [she] didn't leave because [she] was scared[.]" Baker testified that Tara explained Defendant "told [her] that he wouldn't let [her] go." Baker stated that she then advised Tara to inform her mother and the police about the incident.
 {¶ 25} Brenda testified that she discovered Tara crying in her bedroom the day after the alleged rape occurred. Brenda asked Tara why she was upset and Tara responded that "[she] should have never went there. *** [S]he said [Defendant] made her have sex with him *** and she said no[.]" Brenda explained she then told Tara it was not her fault and that they needed to have her "checked out and get it taken care of." She then drove Tara to the hospital.
 {¶ 26} Detective Tadd Davis, of the Medina County Sheriff's Office, was assigned to the case. Detective Davis testified that Tara gave a detailed statement at the police station which implicated Defendant. Thereafter, he tried to contact Defendant to schedule an interview. Detective Davis spoke with Defendant on the morning of October 22, 2001. Defendant had indicated that he would arrive at the station for an interview around 11:00 a.m. Defendant did not show up. Detective Davis explained that he called Defendant's home several times; the phone was never answered. He then went to Defendant's house and was invited inside by Defendant's grandfather.
 {¶ 27} After explaining to Defendant that he was not under arrest, Detective Davis conducted an interview of Defendant. Detective Davis recalled asking Defendant if he knew Tara. His initial response was "no." Defendant then stated that Tara had been to his house but he could not remember when. Shortly thereafter, Defendant's father entered and inquired as to the Detective's presence. Detective Davis recalled explaining to Defendant's father that he was there to investigate a problem with Tara. Defendant's father then asked the detective to leave. Detective Davis testified that he became "very bold at that point and *** explained that [they were] investigating a sexual assault case involving Tara Shank *** and that [they] were interested because there was some physical signs, body fluids, seminal fluids, et cetera." Detective Davis stated that upon hearing those remarks, Defendant responded "Well, there wouldn't be any semen because [he] used a condom." Detective Davis left the residence when the father again requested that he leave. A search warrant was obtained for the bedroom area of Defendant. Detective Davis testified that while executing the search warrant, a box of Trojan condoms, a used condom, and an open condom wrapper were found in a garbage can.
 {¶ 28} Lastly, Defendant offered his testimony. Defendant asserted that he was familiar with Tara from school; they were in different grades but rode the same school bus. He indicated that they talked only occasionally. Defendant recalled observing Tara and Felicia at the cemetery three or four times that summer. The girls would wave and he would say "hi." Defendant further recalled seeing Tara walking home one afternoon. He testified that he stopped his car and they talked. He told her to "stop over" his house if she was ever at the cemetery. Defendant stated that a week later, Tara and Felicia came to visit. Defendant indicated that the three went to his bedroom and watched television and talked. Felicia sat in the chair beside his bed while he and Tara laid on the bed. Defendant stated that "Tara ended up laying her head on [his] chest. [He] ended up *** caressing her hair and caressing her back." Then they kissed and Defendant "ran [his] hand underneath Tara['s] shirt[.]" Tara did not tell him to stop.
 {¶ 29} Defendant stated that later in the afternoon, he drove the girls home. As Tara exited his car, he whispered for her "to come back by herself next time." Defendant asserted that he then called Tara on a Thursday and asked her to come over that Friday afternoon. Tara complied and arrived around 3:15 p.m. They went to Defendant's room and began watching television. Defendant maintained that he was on the bed reading a magazine and Tara was sitting in the chair next to his bed. They were talking about music and M-TV when Tara "ended up coming over to look at the C.D. magazine with [him] and laid down right beside [him] on the bed." Defendant recalled that Tara then laid her head on his chest and he began to rub her hair and back. Defendant asserted that he then "undid her bra" and unbuttoned her pants. He stated that Tara did not say anything at the time because they were kissing. Defendant explained that Tara then "pulled her pants down below her butt. And she put her leg up in the air for [him] to pull her pants off." Defendant testified that he took her pants off and Tara took off her underwear. He told Tara he was going to get a condom and left the room. When he returned, he undressed and put the condom on. He asked Tara if she ever had intercourse before and she said "no." As Defendant inserted his penis, he asked Tara "if [he] was hurting her because she said she was a virgin." Again, Tara responded "no." Fifteen to twenty minutes later, Tara "stated she was getting tired of holding her legs up in the air." Defendant then stopped, and they each got dressed. They talked for a couple minutes about baseball and music and drank "pop." Defendant then explained to Tara that he would be leaving because he had to drive a friend to a meeting. Defendant asserted that he walked Tara to the door and kissed her goodbye. Defendant testified that he never threatened or hurt Tara.
 {¶ 30} After offering this version of the events, Defendant then recalled using two condoms that afternoon. He stated that the condom found by Detective Davis was not the condom he used while having intercourse with Tara. Defendant explained that he put the first condom on his nightstand because he thought he had damaged it. He then opened a second condom, which he used during intercourse. Defendant maintains that both condoms were discarded in the same garbage can, however he had no explanation as to why only one condom was retrieved. Lastly, Defendant indicated that to his knowledge, he did not ejaculate while having intercourse with Tara. He was unable to explain why semen was found on the condom retrieved from his garbage can.
 {¶ 31} After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Defendant of rape. Although conflicting testimony was presented, we refrain from overturning the verdict because the jury chose to believe other testimony. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Consequently, Defendant's conviction was not against the manifest weight of the evidence.
 {¶ 32} This Court has previously observed that "because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 5. As we have already determined that Defendant's conviction was not against the manifest weight of the evidence, we necessarily conclude that there was sufficient evidence to support the verdict in this case. Accordingly, Defendant's first, second, and seventh assignments of error are overruled.
 ASSIGNMENT OF ERROR IX
"The trial court committed error prejudicial to the rights of [Defendant] to have a fair trial by failing to permit counsel to participate in the in camera inspection of prior written statements of [the] State's witnesses."
 {¶ 33} In his ninth assignment of error, Defendant asserts that the trial court improperly denied defense counsel the opportunity to participate in the in camera review of written or recorded witness statements in violation of Crim.R. 16(B)(1)(g). Defendant's contentions lack merit.
Crim.R. 16(B)(1)(g) provides:
"Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
"***
"If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.
"Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal."
 {¶ 34} In the instant case, upon completion of the witness's direct testimony, Defendant's counsel requested that an in camera inspection of the written statements of Detective Davis, Tara, Baker, and Brenda be performed pursuant to Crim.R. 16(B)(1)(g). The court reviewed the alleged statements and determined that no inconsistencies existed. Although Defense counsel was not given the statements, the court copied the portions of the statements that pertained to the witness's testimony and indicated that the statements would be preserved for the record on appeal. However, despite the court's indication that the alleged statements would be preserved for the record, copies have not been transmitted with the record on appeal. As a general rule, the appellant bears the responsibility of ensuring that the record on appeal is complete. See State v. Boyce (Aug. 6, 1999), 2nd Dist. No. 98-CA-95. Accordingly, we are unable to determine whether producible out-of-court witness statements subject to Crim.R. 16(B)(1)(g) provisions existed. When portions of the record necessary for resolution of assigned errors are omitted from the record on appeal, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings. See Knapp v. Edwards Laboratories (1980), 61 Ohio St.2d 197, 199. See, also, Wozniak v. Wozniak (1993), 90 Ohio App.3d 400, 409 (declaring where portions of record are omitted, which are necessary for effective review, the appellate court must affirm).
 {¶ 35} Consequently, Defendant's ninth assignment of error is overruled. See State v. Manning (1991), 74 Ohio App.3d 19, 29.
 ASSIGNMENT OF ERROR III
"The court abused its discretion by denying [Defendant] a fair trial when overruling a motion to compel a psychiatric evaluation of the complainant."
 {¶ 36} In his third assignment of error, Defendant asserts that he was denied a fair trial when the court overruled his motion to compel a psychiatric evaluation of the victim. We disagree.
 {¶ 37} In his "Motion for Independent Psychological Examination," Defendant moved the court for an order permitting the examination of Tara. Defendant maintained that he would be deprived of a fair trial and adequate preparation of his defense if the psychological examination was denied because the "substantial impairment" of the victim was an element of the offense of sexual battery, as defined in R.C. 2907.03(A)(2). That section states: "[n]o person shall engage in sexual conduct with another, not the spouse of the offender when [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." R.C. 2907.03(A)(2).
 {¶ 38} Defendant, however, was not convicted of sexual battery. The jury found Defendant guilty of rape. As "substantial impairment" is not an element of rape, Defendant's assignment of error has become moot. Accordingly, Defendant's third assignment of error will not be further addressed.
 ASSIGNMENT OF ERROR V
"The court committed error prejudicial to the rights of *** Defendant to have a fair trial by not granting a mistrial for misconduct by the prosecuting attorney."
 {¶ 39} In his fifth assignment of error, Defendant argues that he was denied a fair trial as a result of the prosecutor's misconduct. Defendant's argument lacks merit.
 {¶ 40} The Ohio Supreme Court has limited the instances when a judgment may be reversed on grounds of prosecutorial misconduct. See State v. Lott (1990), 51 Ohio St.3d 160, 166. The analysis of cases alleging prosecutorial misconduct focuses on the fairness of the trial and not the culpability of the prosecutor. Id. A reviewing court is to consider the trial record as a whole, and is to ignore harmless errors "including most constitutional violations." Id. Accordingly, a judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial. State v. Carter (1995),72 Ohio St.3d 545, 557.
 {¶ 41} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a reviewing court determines if the questions were improper, and, if so, whether they actually prejudiced the substantial rights of the defendant. See State v. Smith (1984),14 Ohio St.3d 13, 14. "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." State v. Hill (1996), 75 Ohio St.3d 195, 204. Moreover, the defendant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would have been different. See State v. Loza (1994), 71 Ohio St.3d 61, 78-79.
 {¶ 42} In this case, Defendant alleges nine incidents of prosecutorial misconduct: 1) improper identification of a condom wrapper; 2) failure to provide the BCI report to defense counsel; 3) failure to provide oral statement of Defendant to defense counsel; 4) inappropriate questioning regarding Tara's IQ; 5) inappropriate remarks that Defendant "groped" Tara; 6) referring to Defendant as a liar during cross-examination; 7) questioning Defendant as to why he did not respond to Detective Davis' questions; 8) inappropriate remarks concerning a pornographic magazine found in Defendant's bedroom; and 9) inappropriate remarks in closing arguments. For purposes of review, the first three alleged instances of misconduct will be analyzed under evidence and discovery rules.
 Evidence and Discovery {¶ 43} Defendant maintains that "[t]he first instance of prosecutorial misconduct is the identification of the condom wrapper." However, we find that Defendant has waived this error on appeal. When the State proffered the condom wrapper into evidence, the court asked Defendant's counsel if he had any objections. Counsel responded that "[he] would object on relevance." The court overruled defense counsel's objection and the wrapper was admitted. In order to preserve an alleged error, a party must timely object and state the specific grounds for the objection. Evid.R. 103(A)(1). See, also, State ex rel. Rothal v. Smith,151 Ohio App.3d 289, 2002-Ohio-7328 . ./2002/2002-Ohio-7328.doc, ¶ 48. As counsel failed to object on identification grounds, we find that this alleged error is thus waived on appeal. See Blausey v. Stein (1980), 61 Ohio St.2d 264, 266-67 (finding that issues not raised before the trial court cannot be raised for the first time on appeal). See, also, Evid.R. 103(A)(1).
 {¶ 44} Defendant also maintains that the failure of the State to provide defense counsel with a copy of the BCI report was prejudicial error. Upon review of the record, we find Defendant has also waived this error on appeal. Although Crim.R. 16(B)(1)(d) provides for the discovery, on motion of the defendant, of any results or reports of scientific tests or experiments performed in the case, Defendant failed to object on these grounds. Defense counsel did object when the prosecutor remarked that "semen [was] found on the condom that was sent to BCI[,]" but he failed to indicate that he was objecting because he had not been provided with a copy of the BCI report. Additionally, when the State proffered the rape kit into evidence, counsel again objected, but cited relevancy as the pertinent grounds. In order to preserve an alleged error, a party must timely object and state the specific grounds for the objection. Evid.R. 103(A)(1). See, also, State ex rel. Rothal at ¶ 48. Accordingly, these alleged errors cannot be raised for the first time on appeal, as counsel's failure to object on specific grounds resulted in waiver of this claimed error.
 {¶ 45} Additionally, Defendant asserts that he was denied a fair trial when "Detective Davis was permitted to provide to the jury an iteration of an oral statement of [Defendant] which had not been provided to defense counsel in discovery." Although Defendant was entitled to the written summary of his oral statement, pursuant to Crim.R. 16(B)(1)(a)(ii), failure of the court to prevent any references to the statement was harmless error. See Crim.R. 52(A). Although Defendant's counsel objected to the prosecutor's examination of Detective Davis, regarding Defendant's responses to questions about Tara's and her visit to his home, Defendant's counsel had previously posed similar questions to the detective. The testimony elicited by the prosecutor was similar and consistent with the earlier testimony elicited by defense counsel. Accordingly, we conclude that any error resulting from a violation of Crim.R. 16(B)(1)(a)(ii) was harmless as it did not affect substantial rights of Defendant. See Crim.R. 52(A).
 Improper Questions {¶ 46} Next, Defendant maintains that he was denied a fair trial due to inappropriate questions during cross-examination posed by the prosecutor. We disagree.
 {¶ 47} In another assertion of misconduct, Defendant contends that the prosecutor improperly accused him of lying. Generally, referring to or alluding to a defendant as a liar is improper when there is no evidence to support such an accusation. See State v. Franklin,97 Ohio St.3d 1, 2002-Ohio-5304, 2002-Ohio-5304, ¶ 28; State v. Nields, 93 Ohio St.3d 6, 38, 2001-Ohio-1291, 2001-Ohio-1291. However, in the instant matter there was evidence to corroborate the prosecutor's observations. Moreover, the prosecutor's cross-examination of Defendant properly sought to impeach his credibility. "As a general rule cross-examination is `permitted on all relevant matters and matters affecting credibility.'" State v. Slagle (1992), 65 Ohio St.3d 597, 605, quoting Evid.R. 611(B). The scope of cross-examination lies within the sound discretion of the trial court in relation to the particular facts of the case. Slagle, 65 Ohio St.3d at 605, quoting State v. Acre (1983),6 Ohio St.3d 140, 145. A court's ruling will not be reversed on appeal absent a clear showing of an abuse of discretion. Slagle,65 Ohio St.3d at 605, quoting Acre, 6 Ohio St.3d at 145.
 {¶ 48} Detective Davis testified that he telephoned Defendant at 9:00 a.m. and Defendant agreed to come to the police station at 11:00 a.m. for an interview. Defendant never arrived. Detective Davis stated that he telephoned Defendant's home several times throughout the early afternoon and no one had answered. At trial Defendant asserted that he fell asleep and missed the meeting with Detective Davis. He also indicated that he did not receive any more phone calls from Detective Davis that day. Additionally, Detective Davis testified that during the interview, Defendant asserted that he used one condom. Only one used condom and one open wrapper were found in Defendant's bedroom area. Defendant did not indicate that more than one condom was used during his direct examination. However, while being cross-examined, Defendant maintained that two condoms were used. Defendant asserted that both condoms and wrappers were disposed of in the same garbage can although only one was recovered.
 {¶ 49} In the present case, the prosecutor properly sought to impeach Defendant's credibility. The prosecutor fairly sought to point out the contradictions between Defendant's testimony and that of Detective Davis. Consequently, this Court is unable to conclude that the trial court abused its discretion by overruling defense counsel's objections to this line of questions on cross-examination.
 {¶ 50} Defendant also assigns error to the prosecutor's referencing Defendant's silence in response to Detective Davis' questioning. This initial interview was conducted in Defendant's home. He was not placed under arrest. While post-arrest silence may not be used against a Defendant, cross-examination concerning pre-arrest silence does not violate a defendant's constitutional rights. Jenkins v. Anderson (1980), 447 U.S. 231, 238-39, 65 L.Ed.2d 86; State v. Geboy (2001),145 Ohio App.3d 706, 714. Such evidence may be used for impeachment purposes. Jenkins, 447 U.S. at 238-39; Geboy, 145 Ohio App.3d at 714. Consequently, the prosecutor did not act improperly by questioning Defendant about his pre-arrest silence in response to Detective Davis' questions. Jenkins, 447 U.S. at 238-39; Geboy, 145 Ohio App.3d at 714
 {¶ 51} Lastly, Defendant asserts error to the prosecutor's reference to a pornographic magazine that was observed in Defendant's room and his remarks made during closing arguments. At trial, the court sustained defense counsel's objection to the questions concerning this magazine. The court also gave curative instructions during the prosecutor's closing arguments specifically highlighting for the jury that closing arguments are not to be considered as evidence. Moreover, the record establishes beyond a reasonable doubt that even without the prosecutor's alleged improper questions and remarks, the jury would have found Defendant guilty of rape. As Defendant has failed to show that any actions by the prosecutor denied him a fair trial, we conclude that the trial court did not abuse its discretion by failing to grant a mistrial for prosecutorial misconduct. See State v. Sage (1987), 31 Ohio St.3d 173,182 (the granting or denial of a mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion); State v. Reynolds (1988), 49 Ohio App.3d 27, 33 (stating that "[a] mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened"); State v. Franklin (1991) 62 Ohio St.3d 118, 127, (concluding that a mistrial is necessary only when a fair trial is no longer possible).
 {¶ 52} Furthermore, even if the prosecutor's actions were improper, Defendant has failed to show that there is a reasonable probability that the result of the proceedings would have been different absent these alleged errors. See State v. Kobelka, 9th Dist. No. 01CA007808, 2001-Ohio-1723 . ./2001/2001-Ohio-1723.doc, at 3-4. Defendant has not established that the prosecutor's conduct prejudicially affected him. Accordingly, Defendant's fifth assignment of error is overruled.
 ASSIGNMENT OF ERROR VI
"The trial court committed a number of significant errors when ruling on the admission of evidence such that the cumulative effect resulted in *** Defendant not receiving a fair trial."
 {¶ 53} In his sixth assignment of error, Defendant contends that the trial court committed a number of significant errors, when ruling on various issues, which prevented him from receiving a fair trial. Defendant's contentions are not well taken.
 {¶ 54} Pursuant to the doctrine of cumulative error, a defendant's conviction will be reversed when the cumulative effect of errors in a trial results in the deprivation of a defendant's right to a fair trial even though each of the trial court's errors do not individually constitute cause for reversal. State v. DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus.
 {¶ 55} In the instant case, each alleged error has been discussed under the previous assignments of error. A majority of the incidents were found to be either proper rulings or not properly preserved for appeal. Only the cross-examination of Detective Davis pertaining to the oral statement of Defendant was deemed to be harmless error. As such, the doctrine of cumulative error is not applicable as we did not find multiple instances of harmless error. See State v. Garner (1995),74 Ohio St.3d 49, 64. Consequently, Defendant's sixth assignment of error is overruled.
 {¶ 56} Defendant's assignments of error are overruled. Accordingly, the judgment of the Medina County Court of Common Pleas is affirmed.
CARR, J. and WHITMORE, J. CONCUR.